VLAES This morning is number 12, 1655 INSITUFORM TECHNOLOGIES against AMERIK's plans. Mr. Kent, when you're ready. Good morning, your honors. May it please the court. My name is Dan Kent. I represent COSMIC, Sondra Machinenbau, which is the name of the defendant and the manufacturer of the product that's involved in this case. In this case, the issue, and the issue that the district court got wrong, is the royalty base to which the reasonable royalty rate was applied. By using a royalty base that included COSMIC's customers' installation charges and services that are unrelated to, and ancillary to, just the top-hat joint... If we find that all the Georgia Pacific factors taken as a total were evaluated and weighed correctly, does the entire market value rule impose a separate requirement outside and beyond Georgia Pacific? I believe it does, your honor, and I believe the entire market value doesn't apply in this particular case because typically the entire market value rule deals with the infringer's larger product. For example, if you have a car, and the manufacturer of the car is the infringer, and they also make a part of the car, if that part of the car drives the purchasing decision for the entire car, then the infringer's entire car can be used. Or a computer software program, for example, same idea. But here we're not talking about the infringer's revenue. What the district court did here was instead use the customer's revenue, the installer's revenue, as its royalty base instead of the manufacturer's revenue. Well, see, I have a... This case seems unique in certain respects to make this broad pronouncement, and the fact that sticks out to me about this case is, yes, your one client was the manufacturer, but this case also includes the installer, AMF, and they've got... So why is installation not a piece or a part of all of this stuff? They've benefited from that, and they've got AMS, whatever. AMS? America. And those are the installers. So even if we accept what you're saying about manufacturers versus installers and the entire market value rule, et cetera, why isn't this case unique enough so that none of that matters? Well, I need to clarify a couple things that I think were a little confusing when we had the damages hearing in the district court. America itself is not a installer. We initially thought they were. My expert initially thought they were.  They sold my client's products in addition to other products that were used in connection with a larger installation project. And these installation projects included far more than just the joint seal. They included lateral line repair, main sewer line repair. So it's not exactly correct that America was an installer. It was not. But it seems to go beyond then just the manufacturer stuff to be on the closer to the installation, right? We have another party here and damages assessed potentially against that party, which now the other side has. Well, in that case, Your Honor, the Amerix party settled separately with the patentee. They settled. So there was no adjudication of that except by a consent judgment that by everyone's admission. What is the result of that? The result of the consent judgment was the agreed-upon $200 per installation royalty that covered all of the supplies that Amerix might sell to an installer to do an installation. But that was done in the context of what they had. And they have AMS would otherwise have an action against you all for indemnification. That's correct. That's not disputed. And they now stand in the shoes of AMS in terms of having that right, right? They would stand in the shoes because that judgment was assigned to So I guess my question is why aren't we talking about a situation here where we would go beyond just the limited manufacturing base for determining a reasonable royalty? Well, because that's a separate issue than what we have here. We don't have here the issue of what is Cosmic's indemnification liability to Amerix. That's not the issue before the court. Even if it was, it would just be limited to whatever Amerix sales were. But again, that's not the issue on appeal. The issue on appeal is the direct appeal of in situ forms direct damages against Cosmic and whether that royalty rate that the court applied for $136 per installation is reasonable or whether it goes too far beyond Cosmic's own revenue. So the issue that we see here is that the district court's royalty base included all of these revenues from third party installers that we never enjoyed. The royalty base exceeded my client's gross revenue by a lot. The actual royalty exceeded my client's gross revenue at the time of the reasonable royalty negotiation. It would have been $136 and at that time they were selling for only $80. So I've seen no case in this court or anywhere else that allows third party revenue to be the basis for a reasonable royalty award because that goes beyond the authorization of the statute. Section 284 specifically talks about how a reasonable royalty should be for the use made of the invention by the infringer. Well, the use made of the invention by the infringer is measured by the revenue generated by the infringing conduct. Didn't some of your experts talk about the reasonable amounts here to be used and refer to the installation cost as the general reasonable base to be relied on? In situ form's expert talked in conclusory form about a conversation he had with someone in situ form who told him that over time in situ form historically only licensed the full installation amount. No licenses from that time period were ever produced. No witnesses were ever produced that testified unequivocally about that. In fact, the one witness that did testify said he thought he recalled a situation where manufacturer revenue was used as the base. So the evidence was at best mixed but in fact the court cited nothing and in situ form cites nothing before the court that suggests that at the time of the hypothetical negotiation in 2001 there was any precedent for a manufacturer of a single isolated little product that sold for $80 at the time, $155 on average over time, that the royalty on that could be $136. There's just no basis for that if you look at the situation that my client was in. Now if you look at installers, which was their primary target, then yes, that might make sense but that's not the situation we have here. Because the revenue generated by the infringement in this case was merely my client's sale of the product, then you can't expand that by using either the entire market value rule or some indirect infringement theory or something like that to capture downstream revenue enjoyed by others. I think the example I used in the brief is a small surgical implanted device like a stent, something like that, that in itself doesn't cost very much. The purpose of that device is, of course, to be installed in a person's body. But the revenue base to which any reasonable royalty would apply has never, to my knowledge, been held to include the hospitalization and healthcare costs for installing that device. It's always possible to find extreme examples. Let's talk about this case. Yes, Your Honor. And let's talk about the reasoning used by the district judge and tell us why that can't stand. Well, what the district court judge did, Your Honor, is he went through a reasonable royalty analysis under Georgia-Pacific, mainly using my client's own analysis because in situ form didn't do one. They presented this established royalty theory, which the court rejected, I think, properly. But what the court then did, once it found the reasonable royalty rate to be about 5%, it recognized that the royalty base that it was going to use was too large. So it discounted that rate from 5% to 3.4%. But where does it show that had the royalty base been different, it would still have been 5%? Well, he doesn't say that, Your Honor. Exactly. That's why I think you're reasoning backwards. Let's go forward. Okay. But the reason, Your Honor, I'm saying he cannot do that is because the court's recent cases suggest that it's a two-step process, and you can't just lower the rate to make up for an excessive base. The base here that the court used did not include… I don't think we have any case which says that you can't lower the rate in order to end up with a fair result. Well, Your Honor, I'm specifically referencing laser dynamics and Unilock and the discussion in those cases about how the court should not lower the rate merely to make up for an excessive base. And I think that's what the court did in this case. And by using a base that is too high, it exceeded the scope of authorization of the statute. Can you remind me? It's a long week here. Your argument with respect to the excessive base is based on what? That your client manufactures and doesn't install, or is it based on whether or not the installation encompasses unasserted patents as well, or what? Both, actually. The primary argument is that my client's only revenue from the infringing conduct in this case was the sale of its top hat product at $155 per unit, a total of about $4.5 million, total gross revenues. But in addition, the court, if the court was going to include installation revenue downstream, the court should not have included as the base the overall installation cost for an entire lateral line rehabilitation. You have an indemnification arrangement. We know that a patented product or process is infringed if it's made, used, or sold, so that there are others involved in this infringement. What is your reason for why that should be ignored? It's not that it should be ignored, Your Honor, but in this case there was no evidence for the downstream revenue that included services and installation products that we did not use to be included in the base against us. Now, if there were indemnification claims to be made against us, then that would be a different case, but we don't have that case. But if it's a practical matter, you are right, let's assume for a second. They can go after AMS. You've gotten in, and AMS is, well, now you say it's not an installer. I was assuming it was an installer, but let's assume then. And then we're back at the same place, and the bottom line is the same because you're required to indemnify AMS, right? Well, we're only required to indemnify AMS in that hypothetical for what we sold them. We didn't sell them the installation revenue that they got. We didn't sell them any of that. We just sold them this one little piece that they used in this, let's say, $4,000 installation project. If they want indemnification against us, then they would get it for, at most, the full value of what we sold them, not the installation revenue that they enjoyed that we don't get. Let me ask you hypothetically as a policy matter. If somebody is infringing and they're trying to get a foothold in the market through their infringing conduct, so they're going to, let's assume hypothetically, think it's a great idea. I'm going to mark this down to bare bones. Are you suggesting that in that circumstance, there can never be a reasonable royalty that exceeds their own circumstance, even if it's clear that they're really undercutting the market in order to get a niche? If that were the case, Your Honor, I can see where, in a particular case, it might make sense to exceed the selling price, at least at the initial point of sale. Based on all the facts and circumstances, it's clear that the district court would have discretion to do that. In a very limited scope of circumstances, but not here, Your Honor, because what we have here is a clear increase in price over time. An average price came out to be about $155. In that case that you're talking about, the hypothetical, you would also, I think, have to show inducement to be proved, which wasn't proved here. In fact, direct infringement was the only theory the district court used here. If you could show inducement in the hypothetical that you're talking about, where the manufacturer was trying to get installers to use this product versus somebody else's and was inducing them to use it and sell it and install it, then maybe you would have a different circumstance. And maybe in the isolated circumstance where somebody is clearly undercutting the market, there might be an argument to exceed their own revenue, but I don't know that it's authorized by the statute, Your Honor, because what's authorized by the statute is a reasonable royalty based on the infringer's use of the product. Now, we've heard some examples recently, for example, in the McFarland case, Monsanto versus McFarland, where the price wasn't the limit of the liability, but there the use made by the farmer wasn't just the sale of a single product. It was continued use over a couple of years. Or in the Home Depot case, where there was a radial saw that was used that provided benefits to Home Depot. In that case, those ancillary benefits were taken into account to assess a reasonable royalty. The Top Hat product here didn't come with anything ancillary from COSMIC. COSMIC only sold the product, it only got the revenue from that sale, and that's all it ever got. So to extract a royalty against COSMIC for more than that revenue, we believe is unreasonable and violates the statute. All right. Thank you. Thank you, Mr. Kent. You have retained three seconds, I see. Mr. Franklin. May it please the Court. My name is Dean Franklin. I'm with Thompson-Coburn, and I come to you from St. Louis, Missouri. I represent the Plaintiffs In Situ Form Technologies LLC and INA Acquisition Corp, and I am here with my law partner, Alan Norman. We ask the Court to affirm a Rule 55B2, Default Judgment Against Defendant. We understand our role. Please proceed with the substance. What I'd first like to address is the standard that this Court has for affirming these types of awards, and I cite to the Smith-Klein case, 926 F. 2nd. 1168, which states that the Court looks at all of the evidence and, quote, in view of all the evidence is either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty. So the decision of this Court is whether the $136 per unit royalty is so outrageously high that it is unsupportable as an estimate. The Court's analysis, as your friend pointed out earlier, kind of mixes it up, right? I mean, are you allowed to use the two different numbers and say, okay, the base is really high, so I'm going to use a low end of the rate to justify that? Isn't that, as a matter of law, kind of problematic? I don't think so. I think I disagree with what the royalty rate and royalty base is here. I think the royalty rate is $136 per unit and the royalty base is 29,516 lateral liners. And the reason I say that is I look at the ruling on the motion for reconsideration and recognizing that the judge used language. Can I ask you, I'm not familiar with all of those numbers. What about, well, I'm not sure, is the confidential number in terms of the installation cost, is that number confidential? Not in this room. I think received. Okay. The $4,000. I'm focusing on that. He used the $4,000 number, right? Tell me if I'm misreading the record. And then he took the low end of 3.5 to 6 or whatever and said, okay, since the $4,000 may be a high number, I'm going to use the lower end of the percentages to kind of bat it down. If I'm wrong on how things went down, please correct me. I think generally there's language to that effect, but the basis for that is that we have a system of licensing in effect where we charge $200 per unit and it's a blanket license, and it's a blanket license where we have a most favored nation clause within that license such that if we ever have a license that's below $200 for this technology, then we have to lower it for our other licensees. So the judge looked at that $4,000 level, but from the context of in situ form, looking at the $4,000 level, applying 5% and coming up with a $200 per unit royalty. Doesn't Lucent more or less let the judge do what he did there? That is, the base used in a running royalty calculation can always be the value of the entire commercial establishment as long as the magnitude of the rate is within an acceptable range. I think that's a key point, and the word there is range. The way this court has approached cases of this type is the court establishes, or this court has asked the trial courts to establish a range looking at what's the highest possible royalty supported by the evidence, what's the lowest possible royalty, and if the court, quote, in view of all the evidence falls within that range, then this court says that it will accept that royalty here. The evidence that we submitted under Georgia-Pacific, particularly looking at Factor 1, for evidence tending to prove an established royalty, which the trial court found on this factor weighed heavily in our favor, we submitted 14 licenses, 13 of which were admitted into evidence. Were they all in connection with the installation, which is a much higher number than the manufacturer? No, they were not. They were all over the board. What they were consistent with were two things, lateral lining technology and the $200 per unit royalty. We also introduced two court stipulations. Of those 16 pieces of evidence, 15 were admitted. All 15 agreements support $200. There were 13 of those agreements that were in situ form agreements. Every single one of them has a $200 royalty. Defendant complains that some of these licenses were the result of litigation and should be accorded less weight. Seven of the 10 licenses were not a result of litigation. Defendant complains that some of the licenses have kind of a different business, that they're not manufacturers of this product. Three of the licenses are of the same business as defendant. When we asked defendant's expert, how many licenses does it take to establish a royalty, he said two to three. That's at page 78, line 23 to page 79, line 3 of the transcript. As far as defendant's complaint that some of the licenses grant a license to more than the three patents at issue, five do not. Exhibit 1, address 3. Exhibit 2, address 2. Exhibit 12, address 1. Exhibit 14, 3. And Exhibit 15, 2. To summarize the license evidence of ours, every license was for $200. We would simply not license this technology for anything less than $200 because of this Most Favored Nation Clause, because then we'd have to lower the licenses for everyone. If you compare our evidence, our 15 exhibits, to defendant's evidence, license evidence, defendant did not have any license evidence. They did not introduce a single license into evidence. They did not introduce a single financial record into evidence. They had a single witness at this hearing, a $550 expert who was not given access to defendant's record. That's pretty good, $550 for an expert. Or did you mean per hour? $550 per hour. Thank you, Your Honor. This court has held actual licenses to be extremely important in the Georgia-Pacific analysis, and I cite to the Laser Dynamics case, 694F3-51, where this court has held, quote, actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace. The actual licensing evidence is highly probative of the patented invention's economic value in the marketplace. The other aspect of the evidence that places this royalty within the proper range are the rest of the Georgia-Pacific analysis. Defendant's expert claimed to conduct a thorough analysis, and he found that five of the factors favored plaintiff, nine were neutral, and one was in favor of COSMIC. The trial court conducted an in-depth Georgia-Pacific analysis which spanned 23 pages of a 66-page opinion. The trial court found that 11 of the factors favored plaintiff, three were neutral, and one favored defendant. The one that favored defendant, according to the trial court, favored defendant, quote, marginally, unquote, and was factor 14, the expert testimony factor. The two most important factors, factor one for actual licenses, according to the trial court, favored plaintiff, quote, heavily weighs in favor, unquote, of plaintiff. Factor 15, the hypothetical amount, quote, strongly in favor, unquote, to plaintiff. What were the five? I didn't see that. What were the five the expert on the other side said favored the plaintiff? If you know. Yeah, I have them right here. Factor one, the licenses. Did he say factor 15 as well? He did not. Factor eight, the established profitability of the product made under the patent. Factor nine, the utility and advantages of the patent property over the old modes or devices. Factor 10, the nature of the patented invention. Factor 11, the extent to which the infringer has made use of the invention. As mentioned in Mr. Kent's argument, what we have here is a manufacturer who is underselling the market here drastically and coming into this market without regard for the patent rights of my client. And as an example, directing your attention to A4156, Amarik, not defendant, was selling this product at $375, which included the $200 royalty. So, it would be, the court was right to use this per unit royalty and it would have been totally mistaken to use the revenue-based royalty where the revenue that you're basing the royalty on does not take into account the license fee that all the other licensees are paying. It's the difference between revenue and value. Exactly. I'd also like to bring your attention to the default here, which found the defendant in default of not one patent, but three patents. And those three patents cover the entire installation of this lateral line. The first patent covers the junction in the lining from the interior of the main line through the lateral line. The second patent covers the device you use to install that. And the third patent covers, is a method patent, which covers the full installation of the lateral line. And recognizing that the court did not feel it necessary to go to indirect infringement to reach this royalty amount, nonetheless, this defendant has been found in default and judgment has been entered for willful infringement for both direct and indirect infringement on all three patents that cover all aspects of this technology. Why do we care about that? I don't think that that's an issue, frankly. I think that this should be affirmed, frankly, based on the judge's well-reasoned opinion. But if others feel differently, I just wanted to point out to the court that there was a default on the entire technology. And I'd like to discuss in more detail the three licenses that deal with folks that are in the same business as the defendant here. They're the Amarik Engineering, Exhibit 5, EZ Liner, Exhibit 7, Permaliner, Exhibit 8. And the testimony at page 17, line 8, to page 19, line 22, is question, Dr. Flom, with respect to these manufacturers that you mentioned, Amarik Engineering, P-Liner, and EZ Liner, I believe, is that correct? Answer, Amarik, Permaliner, EZ Liner. Question, do they do essentially the same thing that COSMIC does? Answer, yes. And describe that for me. They basically get material, put it in a mold, or have it done for them, and then they sell it into the pipe refining industry to repair laterals. And that's at page 33, line 23, to page 34, line 9. All of those licensees in the United States are paying $200 for the same product that COSMIC does not want to pay $136 for, as far as a license. Thank you, Your Honors. Okay. Thank you, Mr. Franklin. Mr. Kemp, you've exhausted your time. Let's have two minutes for rebuttal. Thank you, Your Honor. Very briefly. The licenses that Mr. Franklin was just discussing all occurred six to nine years after the time of the hypothetical negotiation. And the Permaliner license includes advertisements of installation and whole systems. That was presented to the district court in the hearing. The EZ Liner license, or excuse me, the EZ Liner product range includes a massive range of additional products, not just the top hat that we're talking about infringing here. So the license structure that you just heard about did not exist at or anywhere near the time of the hypothetical negotiation in this case. Nobody has ever presented to the district court or to this court, I don't even believe these licenses are in the record before this court, but view that as it may. Nobody has presented a license that is a manufacturer-specific, product-only license. Did you say that the licenses that your friend was referring to are not part of the record? I don't believe they're in the joint appendix, Your Honor. Well, the record is not a question. You have citations to the record, or you're saying they're not in the material that was filed in this court? I believe that's correct. If so, we may request it. But they're not. The record is the record. The record is, yes. Right. I'm suggesting it's not.  I'm sorry. All right. No, I'm not suggesting that. But what I am suggesting, Your Honor, is that they are not relevant because they came so much later, and those entities, in fact, have a different product mix than my client. In addition, ICI presented no evidence that those licenses were entered into outside the context of threat litigation, and it's their burden to prove that. They presented no evidence on that one way or the other, and the district court so found. Thank you very much. Okay. Thank you, Mr. Kender, Mr. Franklin. The case is taken under submission. That concludes this morning's argued cases. All rise. The court is adjourned this morning until 10 o'clock a.m.